Filed 6/18/13  S.C. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| S.C. et al., | E058266 |
| Petitioners, | (Super.Ct.No. RIJ1201295) |
| v. | OPINION |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | |
| Respondent; | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petitions for extraordinary writ.  Jacqueline C.

Jackson, Judge.  Petition Denied.

David KhanhHung Tran for Petitioner S.C.

Mark A. Hover for Petitioner K.N.

No appearance for Respondent.

1

Pamela J. Walls, County Counsel, and Carole A. Nunes Fong, Deputy County Counsel, for Real Party in Interest.

Petitioners S.C. (Mother) and K.N. (Father) filed petitions for extraordinary writ pursuant to California Rules of Court, rule 8.452, challenging the juvenile court's order denying Mother reunification services as to her three children, and setting a Welfare and Institutions Code section 366.26 hearing.[1]  Mother argues that there was insufficient evidence to support the juvenile court's order denying her services under section 361.5, subdivision (b)(6).[2]  We reject this contention and affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of the Riverside County Department of Public Social Services (DPSS) on December 20, 2012, when an immediate response referral was received alleging physical abuse and general neglect of eight-year-old Ky.R., six-year-old Ke.R., and one-year-old K.N.[3]  It was reported that Ke. had a one inch in diameter red bruise on his left hip, as well as an abrasion on his stomach with purple bruising; that Father had hit Ke. with a bat; and that Father had kept Ke. up all night on a time out with

---

[1]  All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2]  Father joins in Mother's arguments.

[3]  Father is the father of K.N. only.  The father of Ky.R. and Ke.R. is not a party to this appeal.

2

the last incident occurring about one week prior. It was also reported that Ke. ate only two pieces of bread and cereal all day.

When the social worker made contact with Ke., Ke. immediately began to cry and exclaimed that his mother and father would be mad at him if he spoke to the social worker. Ke. eventually disclosed the allegations and showed the social worker his injuries. The social worker observed that Ke. had a visible two-inch red bruise on his left hip area; two healing marks or scars on his chest area; a six-inch scrape mark with developing bruising that covered his left rib area to his sternum area; and several other linear scars and faint, yellow bruising on various areas of his torso. Ke. also stated that Father had tied him up to a chair for "'hours,'" and proceeded to show the social worker how Father had used a rope to wrap him around a chair. Ke. further reported that Mother had been at work, but when she got home she talked to him while he was in the chair.

Ky., who was diagnosed with high functioning Autism, was unable to confirm whether his brother had recently been in trouble. Ky., however, disclosed that they often time do not have enough to eat and that Father gives them two slices of bread and a sandwich bag of cereal to eat.

Due to the extent of Ke.'s injuries and Ky.'s disclosure of not having enough food to eat, the children were placed in protective custody. Ke. and Ky. were transported to a hospital for a medical examination. Ke. was found to have new and old bruises on his stomach and two burn marks. In addition, while the physician's assistant was applying pressure to Ke.'s stomach to check for broken ribs, Ke. cringed and stated it hurt. Ke. also had a bruise on the right side of his forehead which was caused by Father punching

3

him with a closed fist. Ky. did not have any marks or bruises. A urine test revealed that the boys were dehydrated and had elevated pulses, and were given intravenous fluids and food.

While at the hospital, Ke. stated that he did not want to go home and explained how Father had placed him on timeouts. Ke. demonstrated how he had to stand on one leg while the other is bent and tied with tape to his other leg with a book over his head from one hour up to four hours. He also said that sometimes while on timeouts Father would come and kick him in the stomach.

A Child Abuse and Neglect (CAN) team examination was subsequently conducted on Ke. Ke. was found to have numerous bruises, red marks, linear bruises, and burn marks on his stomach, throat, forehead, hand, back, thighs, and buttocks. Ke. reported to the CAN team and law enforcement that the injuries were sustained when Father hit him with a belt and bat; when Father held his hand over a hot stove; and when Mother and Father pulled his ears and hit him with wooden drumsticks on his bare back and buttocks. Ke. also stated that Father had made him eat hot peppers, had rubbed hot peppers in his eyes, had whipped him with a jump rope, and had punched him, choked him, and sat on him. The examining doctor concluded that Ke. had "'multiple patterned bruising, scars consistent with severe physical abuse,'" history of inflicted trauma, and history of "'multiple extensive injuries'" consistent with torture; and that Ke. was subjected to severe physical abuse, emotional abuse, and torture.

Father reported that Ke. had behavioral issues and that he and Mother were constantly receiving calls from his school due to Ke.'s tantrums and throwing chairs. He

4

further stated that Ke. often times lied and stole candy and food. He acknowledged that he had placed Ke. in timeouts by having him kneel on tile flooring for 15 minutes to two hours, and that he had disciplined Ke. based on the severity of his behavior. He denied that he had hit Ke. with a bat and explained that Ke. had often times lied, had a wild imagination, and had injuries due to being very active. Father also stated that he checks the boys every night for injuries and denied seeing any injuries on Ke. Father acknowledged that he and Mother had at times tied Ke.'s legs with a rope or tape to a chair to prevent him from running away when he was supposed to be in timeout or from running around the house; that he had used wooden drumsticks to hit Ke. on the buttocks; and that Mother was aware of Father's methods of the timeouts and will even try to talk to Ke. while he is in timeout. Father also denied depriving the boys of food. Father was eventually arrested for felony child abuse.[4]

Mother was at work when the social worker spoke with Father. She refused to leave work despite Father explaining to Mother that DPSS was taking all three children. As such, the social worker spoke with Mother the following day. Mother stated that Ke. was a liar and that she believed her husband. She then admitted that she had given permission to Father to discipline the boys when she was not at home. She then refused to answer questions about the boys being tied up during timeouts without consulting her attorney. However, to an investigating detective, Mother reported that "in their culture, they beat their children and it is normal for 'things like that to occur,'" and that "'I was

---

[4] Mother was also eventually arrested, and criminal charges were filed against both parents.

beaten when I was a child and look how I turned out.'" She also admitted that she and Father had used timeouts that consisted of the children kneeling on the floor and that the timeouts last for days at a time if the behavior is not corrected by the child. Mother also admitted that spanking or slapping in the face is used when the children are caught lying or stealing and confirmed that Father had taped Ke. to a chair as a form of punishment. She denied knowing that Ke. had injuries or knowing anything was going on in her home, despite bathing the children every night. When shown photographs of Ke.'s injuries and asked how she had not noticed them, Mother had no explanation.

The family had prior referrals for physical abuse and general neglect with CPS. A referral was received on December 9, 2011, for general neglect and physical abuse. The referral stated that Ky. had a bruise under his left check. The parents reported that the injury was a result of the boys boxing and showed DPSS an area designated for boxing, which included boxing equipment and protective gear. The allegations were subsequently unfounded. Another referral was received on March 14, 2012, alleging general neglect. It was reported that Ky. had a one inch bruise near his hairline. Another immediate response referral was received on March 22, 2012, alleging physical abuse of Ke. after Father had pushed the child's face into a sink full of water. At that time, following a team decision meeting, the family agreed to voluntary family maintenance services. The services were, however, discontinued in May 2012 after the parents, especially Father, were uncooperative. The parents had also stated that they did not desire any further interaction with the social worker. Finally, another immediate response referral was received on October 3, 2012, alleging general neglect and physical

6

abuse after Ky. was observed with fingerprint bruises on his arm and his stomach was a little distended. The allegations were determined to be unfounded after an investigation revealed that the bruises were a result of boxing with Father and the distended stomach was due to the child overeating.

On December 24, 2012, a petition was filed on behalf of the children pursuant to section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), (g) (no provision for support by the father of Ke. and Ky), (i) (cruelty), and (j) (abuse of sibling).[5] At the detention hearing, the children were formally removed from their parents and placed in foster care. The parents were offered services and visitation.

Ke. and Ky. were placed in the home of Ms. M, and K. was placed in the home of her paternal uncle and aunt. The boys appeared to be healthy, happy, and well cared for. Ky. disclosed that he had also been subjected to timeouts and physical abuse by Father. Both the boys reported that they desired to stay in Ms. M.'s home and were very scared of Father. Ky. further stated that he was not scared of Mother but admitted that she was present at times when the abuse occurred. Ke. stated that he was scared of his mother and paternal grandparents, because they would tell Father when he would get in trouble, and Father would punish him and Mother would not stop him. Ms. M. reported that she has had no problems with the boys; that the boys had not asked about their parents; and

---

[5] The petition was later amended on December 28, 2012, to include allegations that Mother had inappropriately administered physical discipline to Ke. by pulling the child's ear and assisting Father in tying up the child to a chair; and that the parents had been provided with voluntary family maintenance services and failed to benefit from the services provided.

7

that the boys were fearful that Father would find them and take them. Ky.'s instructional aide reported that since being placed in foster care, she has seen a remarkable difference in Ky. He now appeared very happy, smiled often, and had told her that he did not want to go back with his mother because he was happy. School records did not indicate that Ke. had ongoing behavioral issues and there were no concerns noted from his school.

Mother had participated in supervised visits with the children. The visits appeared to have been going well and there were no concerns until the January 31, 2013 visit. At that visit, Mother had given Ke. a card from Father, who had been directed to have no contact with the children, and the boys began acting up. The card was a computer generated card with the words "'Boxing Time!'" on the outside, and a note from Father stating that he missed them and could not wait for them to come home so they can box again. The foster mother reported that Ke., who was normally friendly with other foster children in the home, had hit another child and wet his bed. In addition, Ky. had been "'harassing'" Ke. and telling him he was going to get in trouble. The foster mother also reported that the children never play on the play area but have to sit with Mother during the entire visits; that Mother never asks the boys if they want to play; and that the boys had sad faces watching other children play. Ke. admitted that during visits they do not play on the play area and that made him sad; and that he desired to continue to see his mother but asked if they could play during the visits. Ky. also confirmed that they do not play during visits and desired to continue to see Mother but less often.

The social worker recommended that reunification services be denied to the parents pursuant to section 361.5, subdivisions (b)(5) and (b)(6).[6] Based on the evidence in this case, the social worker believed that the parents would not benefit from services and that offering services to the parents would not be in the children's best interests.

The contested jurisdictional/dispositional hearing was held on February 27 and March 1, 4, 6, 7, 8, and 11, 2013. Following the lengthy trial and hearing testimony from the boys, the social workers, and arguments from the parties, the juvenile court found all the allegations in the amended petition true, except allegation b-3 pertaining to Mother's neglect of the boys due to dehydration. The children were thereafter declared dependents of the court, and removed from parental custody. Reunification services were denied to Mother as to all three children and Father as to K.N. pursuant to subdivision (b)(6). The court found that reunification services were not in the children's best interests, and set a section 366.26 permanent planning hearing.

Mother and Father seek extraordinary writs requesting that we vacate the order setting the matter for a permanent planning hearing and order DPSS to provide family reunification services to them.

---

[6] All future undesignated subdivision references are to section 361.5 unless otherwise stated.

II

DISCUSSION

Mother argues that there was insufficient to support the juvenile court's order denying her reunification services pursuant to subdivision (b)(6). Father joins in Mother's arguments.

Whenever a child is removed from the custody of a parent or guardian, subdivision (a) directs that the court shall offer the parent or guardian reunification services, unless it finds by clear and convincing evidence that one or more exceptions or bypass provisions described in subdivision (b) apply. (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 63-64 (*Ethan N.*); *In re Angelique C.* (2003) 113 Cal.App.4th 509, 516 (*Angelique C.*).) The general rule of subdivision (a) reflects a "strong preference for maintaining the family relationship if at all possible. [Citation.]" (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474.) When, however, one or more of the exceptions or bypass provisions apply, "the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources. [Citation.]" (*Id.* at p. 478.)

Subdivision (b) requires bypass findings to be supported by clear and convincing evidence. "Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt." (*Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 852 (*Tyrone W.*).) "'"The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence

to support its conclusion, the determination is not open to review on appeal.""'" (*Angelique C.*, *supra*, 113 Cal.App.4th at p. 519.) When, as here, the court finds that a parent or guardian is described in subdivision (b)(6), the parent or guardian has the burden of affirmatively demonstrating that reunification with the child—and therefore offering reunification services to the parent or guardian—would be in the child's best interest. (*Ethan N.*, *supra*, 122 Cal.App.4th at p. 66; *Tyrone W.*, at p. 846; § 361.5, subd. (c).)

The court has broad discretion in determining whether the parent or guardian has met this burden and therefore whether to offer the parent or guardian reunification services under subdivision (c). (*Angelique C.*, *supra*, 113 Cal.App.4th at p. 523.) An appellate court may not disturb the trial court's best interest determination absent a showing of an abuse of discretion. (*Id.* at pp. 523-524.) An abuse of discretion is shown when there is no substantial evidence to uphold the findings. (*Ethan N.*, *supra*, 122 Cal.App.4th at pp. 64-65.)

Under subdivision (b)(6), the court must deny reunification services to a parent when "the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of . . . the infliction of severe physical harm to the child, a sibling, or a half sibling by a parent or guardian . . . and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian."

Severe physical harm may be inflicted, inter alia, "by an act or omission of the parent . . . or of another individual . . . with the consent of the parent . . . ." (§ 361.5, subd. (b)(6).) Thus, by "its express terms, subdivision (b)(6) applies to the parent who

11

inflicted severe physical harm to the minor" (*In re Kenneth M.* (2004) 123 Cal.App.4th 16, 21) or consented to such harm inflicted by another individual.  Unlike subdivision (b)(5), subdivision (b)(6) does not apply to a negligent parent who reasonably should have known of the abuse.  (*Tyrone W.*, *supra,* 151 Cal.App.4th at p. 851.)  "[W]here there is no evidence to show both parents knew the child was abused or injured, the court must identify the parent who inflicted the child's injuries before denying reunification services to that parent under . . . subdivision (b)(6)."  (*Id.* at p. 852.) Thus, subparagraph (b)(6) "requires identification of the perpetrator."  (*Kenneth M.*, at p. 21.)

Here, the juvenile court denied the parents services, having found Ke. was severely physically abused.  The court identified Father as the perpetrator.  As to Mother, the court found that Mother "did consent to the behavior.  She told Detective Ramirez that [Father] had permission to discipline the boys, that timeouts could last for days at a time if [the] behavior wasn't corrected according to their satisfaction, that slapping or spanking—slapping in the face was used, and that [Father] did in fact tape [Ke.] to chairs as [a form] of punishment, that getting beaten with sticks and brooms was acceptable in her culture."  Substantial evidence supports the court's findings that Father inflicted severe physical harm to Ke., and that Mother knew and had consented to the abuse.

Relying on *Tyrone W.*, *supra*, 151 Cal.App.4th 839, Mother argues that section subdivision (b)(6) does not apply to her because there is no evidence that she *knew* of the abuse or injuries to Ke. or that she *consented* to Father's abuse of the children.  In *Tyrone W.*, after an infant died of sudden infant death syndrome, the medical examiner discovered she was suffering from several two-week-old rib fractures that were deemed

12

suspicious and "'likely indicative of child abuse.'" (*Tyrone*, *supra*, at p. 853.) After the infant's sibling was found to be a child described by section 300, subdivisions (b) and (j), the juvenile court denied reunification services to the parents pursuant to subdivision (b)(6). (*Id*. at p. 845.) After the reviewing court examined the evidence, it found that the infant's injuries were not visible and there were no signs of injury; nor was there any evidence to show that, if one parent had inflicted injury on the infant, the other parent knew about it. (*Id*. at pp. 851-852.) Given those circumstances, the court stated: "We do not believe section 361.5, subdivision (b)(6) applies to a parent who 'reasonably should have known' of the abuse because that parent was not complicit in the infliction of physical harm by act, omission or consent. As defined in subdivision (b)(6), omission and consent both require actual knowledge, if not of the physical harm itself, then of another's abusive acts. We hold that subdivision (b)(6) applies to the parent or parents who inflicted severe physical harm to the child whether by act, omission or consent, and does not apply to a negligent parent." (*Id*. at p. 851.) The court explained that, as "defined in subdivision (b)(6), omission and consent both require actual knowledge, if not of the physical harm itself, then of another's abusive acts. We hold that subdivision (b)(6) applies to the parent or parents who inflicted severe physical harm to the child whether by act, omission or consent, and does not apply to a negligent parent." (*Ibid*.)

The *Tyrone W.* court, however, concluded by stating that it did "not quarrel with the proposition that when the child's injury or injuries were obvious to the child's caretakers and they failed to act, the court is not required to identify which parent inflicted the abuse by act and which parent inflicted the abuse by omission or consent. In

13

such a case, the evidence supports a conclusion that both parents knew the child was injured or being abused." (*Tyrone W.*, *supra*, 151 Cal.App.4th at p. 852.) Ultimately, the *Tyrone W.* court affirmed the denial of reunification services on the ground that the sustained allegations under section 300, subdivision (j), showed more than negligence. (*Tyrone W.*, at p. 854.)

Here, unlike in *Tyrone*, Ke. had bruises and scars all over his body. As found by the juvenile court, Ke. had marks "from his scalp to his ankles, and they cover his body. I haven't seen bruises cover a body like this in a very long time." The court further commented that "[Ke.] does not merely have bruises. [Ke.] has scars, [Ke.] has a deep cut on his hand, a slash on his penis, burn marks and bruises. And looking at the bruises, some look like they're in different stages of healing than others. Some are dark in color. Some are redder in color. [¶] So we're not talking about, it's evident to the court, a single incident in which there are some bruises that heal on [Ke.] It's quite evident there is substantial inflicted abuse on [Ke.] And that's borne out by the CAN exam itself."

The CAN examination found that Ke. had numerous bruises, red marks, linear bruises, and burn marks on various parts of his body, including his stomach, throat, forehead, hand, back, thighs, and buttocks. Ke. reported that the injuries were sustained when Father hit him with a belt and bat; when Father whipped him with a jump rope; when Father punched and choked him; when Father held his hand over a hot stove; and when Mother and Father pulled his ears and hit him with wooden drumsticks on his bare back and buttocks. The examining doctor concluded that Ke. had "'multiple patterned bruising, scars consistent with severe physical abuse,'" and history of "'multiple

14

extensive injuries'" consistent with torture. As the juvenile court found, "it rather incredible that any mother of a six-year-old child would not notice" the marks all over his body.

Besides Ke.'s obvious physical injuries, there was also evidence that Mother was aware of Ke. being tied up in a chair and that she had even spoken to Ke. while he was tied up in the chair. The evidence also showed that Mother had at times tied Ke.'s legs with a rope to a chair to prevent him from running away; that Mother had used wooden drumsticks to hit Ke.; and that Mother was aware of Father's methods of disciplining the boys and had given Father permission to discipline the boys. Mother admitted that she and Father had used timeouts that consisted of the children kneeling on the floor and that the time outs lasted for days at a time and that spanking or slapping in the face was used when the children are caught lying or stealing. Moreover, she had informed law enforcement that in their culture, it is acceptable to beat their children as a form of discipline. And, when she was shown photographs of Ke.'s injuries and asked how she had not noticed any of the injuries, Mother had no explanation.

The evidence here supported the juvenile court's determination that Mother's conduct amounted to the type of omission or consent required for the application of subdivision (b)(6).

Mother next argues that the juvenile court failed to properly consider whether services would benefit the children and whether granting services was in the children's best interests.

15

When the prerequisites of subdivision (b)(6) are met, the juvenile court "shall not" order reunification services for the offending parent unless it finds, "by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c).) ""'[O]nce it is determined one of the situations outlined in subdivision (b) applies, the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources. [Citation.]"' [Citation.] The burden is on the parent to change that assumption and show that reunification would serve the best interests of the child." (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227.) In determining whether reunification is in the child's best interest, a court considers any information it deems relevant, including the "specific act . . . comprising . . . the severe physical harm inflicted on the child," the "circumstances under which the abuse or harm was inflicted," the "severity of the emotional trauma suffered by the child," "[a]ny history of abuse of other children by the offending parent," the "likelihood that the child may be safely returned to the . . . parent . . . within 12 months with no continuing supervision," and "[w]hether . . . the child desires to be reunified with the offending parent . . . ." (§ 361.5, subd. (i).)[7]

Here, the specific acts constituting the abuse were egregious, causing Ke. to suffer severe physical and emotional harm. The circumstances of the abuse were exacerbated by Mother's acts or omissions in condoning the abuse; Mother's dishonesty and denial of the abuse; Mother's statement that Ke. was a liar and that she did not believe the

---

[7] Subdivision (i) was formally referred to as subdivision (h).

16

disclosures made by Ke.; and Mother's past unwillingness to participate in voluntary family maintenance services. In addition, the family had a history of five past referrals over the course of one year involving physical abuse and neglect of the children, yet Mother continued to allow the abuse of her children.

Further, it was unlikely the children would be returned to Mother within 12 months. The boys consistently stated that they wanted to stay in foster care and not return home. At the jurisdictional/dispositional hearing, Ke. testified that he did not want to go home with Mother; and when asked if he wanted to go home with Mother if Father did not live there, he said "I don't know." Although Ky. testified that he wanted to go home, when asked if he wanted to go home "today" or "wait a little bit," he said, "maybe just stay here." Hence, it appears that Ky. may not have wanted to go home to Mother. In any event, Ke. and Ky. prior to the jurisdictional/dispositional hearing, had consistently stated that they were happy in their foster home and that they did not want to go home.

The boys also stated that they were afraid of Father. Ke. also stated that he was afraid of Mother and believed that Mother would not protect him. In addition, while in foster care, the boys never discussed why they were in foster care or asked about their parents. Moreover, Ky.'s teachers reported that they had observed a remarkable difference in Ky. since he was removed from his home, noting that he appeared to be happy, smiled often, and told them that he did not want to go back with his mother because he was happy. Indeed, the record reveals that the boys were happy and were

doing well in their foster home.  The boys also indicated that they wanted to visit Mother but less often because they did not get to play.

Regarding K.N., due to her young age, Mother would have had to demonstrate substantial progress within six months had reunification services been offered.  (§ 366.21, subd. (e).)  Based on Mother's statements, actions, omissions, and her inability to make use of services in the past, it was unlikely services would be effective within the six-month period.  In addition, due to K.N.'s tender age, even if Mother received 12 months of services, she would still be too young to protect herself from Father or Mother.

The juvenile court's finding that reunification services would not be in the children's best interests is supported by sufficient evidence.

Mother argues that the juvenile court failed to adequately consider the factors set forth in subdivision (i), instead primarily focusing on Ke.'s injuries.  We find no error in the process by which the court determined that reunification services for Mother would not benefit the children under subdivisions (b)(6) and (i).  Subdivision (i) directs a dependency court applying subdivision (b)(6) to consider "any information it deems relevant," including the six listed factors, as noted *ante*.  Subdivision (i), however, does not require a mechanical listing of the dependency court's finding on every factor listed in subdivision (i).  (*In re S.G.* (2003) 112 Cal.App.4th 1254, 1259-1261.)  Indeed, the court in *In re S.G.* held that findings may be implied rather than explicit, and a reviewing court "will infer a necessary finding provided the implicit finding is supported by substantial evidence.  [Citations.]" (*Id*. at p. 1260.)

18

In support of her argument that the court erred by failing to identify the factors set forth in subdivision (i), Mother cites *In re Rebekah R.* (1994) 27 Cal.App.4th 1638 (*Rebekah R.*). That case, however, is inapposite. Subdivision (i) applies only if the dependency court finds true the predicate facts that invoke subdivision (b)(6): severe sexual abuse or severe physical harm. In *Rebekah R.*, the dependency court did not find facts to support subdivision (b)(6) or even invoke that subdivision. (*Id.* at pp. 1650-1651.) Further, although the *Rebekah R.* court did state that subdivision (i) factors are "some of the factors the court is entitled to consider" in making its determination regarding reunification services under subdivision (b)(6), it did not hold that a court must expressly identify each factor specified in subdivision (i), or any of them, in making its decision. (*Id.* at p. 1651.)

In the present matter, the court implicitly and expressly considered and discussed the factors of section 361.5, subdivision (i), including the circumstances of the abuse, the severity of the abuse, the specific acts or omissions comprising the abuse, the trauma to Ke., and the family's past history with CPS. Mother has not established error. In fact, Mother fails to provide evidence favoring her position that granting reunification services is in the children's best interests; instead, focusing on what factors the court failed to adequately consider and pointing out that services were not provided by DPSS following the detention hearing.

In sum, we conclude that the juvenile court did not abuse its discretion in denying Mother and Father reunification services.

### III

### DISPOSITION

The petitions for extraordinary writ are denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ\
P. J.

We concur:

MILLER\
J.

CODRINGTON\
J.